Adamchick *v.* Wyoming Valley Collieries
Company, Appellant.

Argued December 1, 1938.   Before KEPHART, C. J.,
SCHAFFER, MAXEY, DREW, LINN and STERN, JJ.

402

*Wm. A. Schnader,* with him *Wm. A. Skinner,* for appellant.

*Roger J. Dever,* for appellee.

OPINION BY MR. JUSTICE SCHAFFER, January 9, 1939:

Are the widow and minor child of George Adamchick entitled to receive compensation from his employer, Wyoming Valley Collieries Company, as a result of his death? It is claimed that his death resulted from a fracture of the sixth cervical vertebra, due to an accident at the employer's mine. To establish their claim, it must be shown that the deceased met with an accident while engaged in the course of his employment. The referee found there was no proof of an accident. The Workmen's Compensation Board concluded there was such proof. On appeal to the Court of Common Pleas, that tribunal agreed with the referee. When the dispute was carried to the Superior Court, its view coincided with that of the Board (131 Pa. Superior Ct. 72). With these conflicting determinations before us, we are to decide whether an accident was proven.

Prior to November, 1932, a fibro sarcoma, a malignant growth, developed on the left side of the neck of the deceased. It was removed by an operation on the 19th of that month. The wound healed and Adamchick returned to work on December 15th. On January 9, 1933, he was employed by defendant as a helper to Anthony Kaminski, a miner. At that time, he was taking pills and told Kaminski that he did not feel good. On the following day, January 10th, so his wife testified, he was "all right" when he left home, in the early morning. The two men began work about half past six. It became necessary for them to carry three mine railroad ties about fifty feet. The ties were four and one-half feet

long and weighed ten or fifteen pounds each. Describing
what happened, Kaminski said Adamchick took two of
the ties and placed them upon his, Kaminski's back. The
latter told the deceased to take the remaining one. Kam-
inski did not see Adamchick pick up the tie. When the
former reached the place where the ties were to be put,
Adamchick came to him, not carrying the tie, saying,
"Oh my neck, Oh my neck," adding that he did not want
to work that day and desired to go home. Kaminski said
the deceased did not tell him he had been hurt by the
tie. Kaminski took him to the shanty where the "bosses"
were. One of the mine officials testified that Adamchick,
when he arrived at the shanty, was asked what had hap-
pened to him, if anything had fallen on him, or hit him,
and he answered no, that he was stooping over in the act
of picking up a tie when he got a pain in his shoulder.
Another of the mine officials testified that from the posi-
tion of the man he thought something had hit him on the
shoulder; he asked what had hit him and Adamchick
said nothing had hit him, "something just took me in the
neck," as he started to pick up the tie. The third mine
official related the same story. All of the foregoing
negatives the idea of an accident. If the deceased met
with an accident, there is nothing to show that it oc-
curred on defendant's property or when or where it hap-
pened. No explanation was offered to indicate how
Adamchick could have suffered a fracture of the sixth
cervical vertebra, which is located about eight inches be-
low the point where the spinal column enters the skull,
by anything he did on January 10, 1933. The Compen-
sation Act (June 2, 1915, P. L. 736, Sec. 301, 77 PS
Sec. 431) provides for "compensation for personal in-
jury to, or for the death of, such employee, by an acci-
dent, in the course of his employment." In *Billo v. Alle-
gheny Steel Co.*, 328 Pa. 97, 195 A. 110, speaking through
Mr. Justice MAXEY, we said (p. 101): "The conclusion
is inescapable that only when an employee *meets with an
accident* in the course of his employment do the provi-

sions of the act become operative as to him," and in *Gausman v. Pearson Co.,* 284 Pa. 348, 354, 131 A. 247, we declared: "Disability, overtaking an employee at his work, is not compensable unless the result of accident . . . neither can death or disability overtaking an employee in the course of his employment and resulting from a natural cause; if it could, it would render the employer an insurer of the life and health of the employee."

On this phase of the case, the Superior Court in its opinion says (131 Pa. Superior Ct. 72, 75): "There is no direct testimony that the handling of the mine ties by deceased caused the fracture, but we are of the opinion that the circumstances are such as to warrant that inference, and to support the finding of the board that the fractured vertebra was sustained by an accident on January 10, 1933." We are unable to find any evidence in the record showing circumstances which would warrant the inference. It is further said: "This inference is warranted, as the board has pointed out, by the natural sequence of events. Deceased was in apparent good health. [The evidence indicates otherwise. He was taking pills; did not feel good and the X-ray taken on the day he complained of his neck and entered the hospital showed a "mass" in his neck indicating the return of the sarcoma.] A few moments after lifting the mine ties to the shoulder of Kaminski he made complaint, indicating that something unusual and extraordinary had happened to him." The testimony does not show anything happening except his having pain in his neck. What he said to the mine officials at the shanty amounts to a denial that any accident had happened. In the opinion it is further said: "Manifestations of an injury were immediately apparent after deceased lifted the ties." If by this is meant injury from an accident, the testimony fails to show it. The Superior Court recognized the rule that the mere fact that an employee is overcome while at work does not of itself support an award of compensa-

tion, but bases its conclusion that the claimant here is entitled to an award, notwithstanding this rule, on the following: "But in the present case deceased was in good health immediately before handling the ties, and immediately after indicated that something unusual had happened to him, which, upon removal to the hospital, was found to be a fractured vertebra. A bone fracture from such an act in the course of the normal duties of an employee is an injury by accident, or an accidental injury. Such break was not an occurrence in the normal, ordinary or usual progress of a disease. It is argued on behalf of appellee that there was no evidence that the alleged 'chip' from the margin of the vertebra was due to violence from accidental means. This contention is not sound. We have repeatedly stated that there is a distinction between 'an accidental injury' and 'an injury by accidental means.'" This conclusion we think disregards the established facts that Adamchick was not in good health, that there was no evidence of any kind on his body that he had been struck by anything, his own declaration to the mine officials that he had not been, and the proof that he had not picked up the tie, which was the only thing that could have injured his vertebra. In this connection, it is important to remember that he declared to the mine officials that nothing had fallen on him or hit him but that he was stooping over in the act of picking up the tie when the pain in his neck occurred.

The finding of the referee, under the proofs submitted, was the correct finding. It was, "From the preponderance of evidence in this case, consisting of medical and lay testimony, we must conclude that there is nothing herein to warrant us in finding that the disability suffered by the decedent, which resulted in his death, was due to any accident occurring on January 10, 1933, in the mines of the employer. From the testimony given in the case, we are led to conclude that the disability and death of the decedent was entirely due to the sarcoma which he suffered prior to the time of the alleged acci-

dent, without any aggravation thereto by any injury sustained on January 10, 1933. Under all the testimony we can find no evidence which would warrant us in finding that the decedent did sustain an injury in an accident on January 10, 1933." This finding met the approval of the Court of Common Pleas, which says in its opinion: "The mere fact that he suffered pain in the region of the neck is not unexplainable without the happening of an accident, since there is much testimony that he did have a cancer. We fail to find testimony that there was an accident, and we do find testimony accounting for a death through natural causes." The board was in error in saying: "That the weight of the evidence, together with the natural sequence of events, supports a conclusion that death resulted from complications growing out of an accident sustained while at work in the defendant's mine on January 10, 1933." The board did not pursue the proper legal pathway in reaching the conclusion which it did by stating that, while there was no direct proof of any accident happening, "There is some testimony of fellow employees to the effect that there was no accident, and some of these witnesses, including the mine foreman and his assistants, testified to alleged statements of the deceased to the effect that there was no accident. However, it seems to us that if a claimant, in the absence of direct proof, is compelled to rely entirely upon the statements of fellow employees who are often not in a position to testify freely because of their interest, a great hardship would be worked as to many worthy claims." There was nothing shown to impugn the statements of the mine officials as to the declarations made by Adamchick to them that nothing had fallen on him and that he had not met with an accident. No testimony in the case shows that he did and on the other phase of the case, the testimony of the doctors, grave doubts are raised as to whether there was a fracture of the vertebra.

Dr. Davis, called by claimant, who took charge of Adamchick when he was admitted to the hospital, said that Adamchick stated he was attempting to lift a tie and was seized with a pain in the neck. He had X-rays taken by another doctor, Dr. Howell, whose report was: "There is a fragment of bone fractured off the lower anterior margin of the sixth cervical vertebra. It is slightly depressed. There is no pathology of the skull." Dr. Davis testified that he saw the X-rays and disagreed with the report and with a diagnosis of a fracture of the vertebra, and that, if a fracture was present, it was due to sarcoma. Dr. Howell testified that the X-ray plate showed, as above outlined, that he could not state whether the fracture appearing was due to trauma or disease and that the plate also showed a mass on the side of the neck. Dr. Brown, who attended Adamchick from the time he left the hospital until he died on April 8, 1933, said that his later condition of loss of motion and paralysis and ultimate death was due to pressure on the spinal cord, to which the fracture contributed but without an autopsy (which the claimant refused) he was unable to tell what caused the pressure on the spinal cord.* Dr. Daley, one of the surgeons who removed the sarcoma in November, 1932, gave it as his opinion, in answer to a hypothetical question, that the fracture described by Dr. Howell caused the death. In arriving at the conclusion that the deceased had met with an accident, he took into account that the claimant had told him her husband "had put a prop on his neck." This statement it is obvious he should not have taken into account. Dr. McLaughlin, the other surgeon who performed the sarcoma

---

\* When the exact cause of death can be determined only by an autopsy and the claimant refuses to permit it to be performed, the responsibility must rest with her: *Walsh v. Lockhart I. & S. Co.,* 118 Pa. Superior Ct. 467, 180 A. 123; *Swiderski v. Glen Alden Coal Co.,* 114 Pa. Superior Ct. 21, 173 A. 865; *Carroll v. Willow Brook Co.,* 108 Pa. Superior Ct. 580, 165 A. 550; *Riley v. Carnegie Steel Co.,* 276 Pa. 82, 119 A. 832.

operation, in answer to a hypothetical question inquiring whether the fractured vertebra was a contributory factor in the death, said he thought so. Dr. Hanlon, called by claimant, answering the hypothetical question, gave it as his opinion that the fractured vertebra was the cause of death. Dr. Jackson, called by defendants, a specialist in Roentgenology, with thirty years' experience, testified that he had examined the X-rays taken by Dr. Howell and that they did not show any fracture of the vertebra or any fragments of bone fractured from its margin, and that in his opinion the deceased suffered a typical malignant death from a metastasis to the spinal cord, that, taking into account the removal of the sarcoma from his neck, the later pain in his neck was due to the sarcoma recurring. Dr. Davis, recalled by defendant, said that there were no marks, bruises or abrasions on the body of the deceased when he examined him on his entrance to the hospital and that the symptoms described by his physicians, who attended him after he left the hospital, were absolutely typical of a death from sarcoma. Dr. Grover, who was called in consultation with Dr. Davis, when Adamchick entered the hospital, said that he did not agree with Dr. Howell that the X-ray showed a fracture, that there were no marks, bruises or abrasions upon the patient, that he suffered no paralysis while in the hospital, and that if he had sustained a fracture of the vertebra, which affected the spinal cord in any way, there would have been some manifestation of paralysis immediately and that in his opinion death was due to the sarcoma. Dr. Rogers, called on behalf of defendant, who specialized as a Roentgenologist, and who examined the X-ray films while on the witness stand, testified that he could see no evidence of fracture or dislocation. While we do not base our conclusion upon the medical testimony, we feel bound to say that it raises a grave doubt in our minds as to whether a fracture existed. We rest our conclusion solely upon the absence of proof of an accident.

*Lacey v. Washburn & Williams Co.*, 309 Pa. 574, 164 A. 724, reviews the cases dealing with the question of what constitutes an injury by an accident within the meaning of the Workmen's Compensation Act. We there said, speaking through Mr. Justice DREW (p. 577): "The word accident—as used in the act—must be interpreted in its usual, ordinary, popular sense. Webster has defined it as 'an event that takes place without one's foresight or expectation; an undesigned, sudden, and unexpected event; chance, contingency.' Many courts have quoted this definition, and some have added to or embellished it, but in reality few have improved upon it. It would answer no good purpose to call attention to the many immaterial variations and additions. Our decisions interpreting the word as used in our compensation law have substantially clung to this meaning. . . . It is, therefore, absolutely indispensable that the important words and clauses of that statute be interpreted without ambiguity. It is further essential, in deciding the multitude of border line cases, first to determine definitely the real meaning of the word 'accident' as used in the act and the general principles by which its interpretation must be governed, and then to reason closely in order to apply clearly those principles. That which distinguishes an accident from other events is the element of being unforeseen; an accident is an occurrence which proceeds from an unknown cause, or which is an unusual effect of a known cause, and hence unexpected and unforeseen. The death of an employee, unless it is the result of some untoward happening, not expected or designed, a mishap or fortuitous happening, aside from the usual course of events, is not compensable under our statute. An examination of the decisions of this court and of our Superior Court, dealing with situations similar to that now before us, brings out clearly the distinction between compensable and noncompensable deaths; it will be found that in all cases where compensation was awarded some 'untoward occurrence,' some 'unforesee-

able mishap,' was the operative cause of the employee's death, while in those cases in which compensation was denied, no such unusual happening occurred."

After giving careful consideration to the provisions of the Workmen's Compensation Act, the policy which underlies it, our own decisions and those of the Superior Court, not all of which seem to be in full harmony, our conclusion is that to secure compensation there must be proof both of an accident and of an injury; an accident cannot be inferred merely from an injury. There must be some evidence of an accident, either direct or circumstantial, in the latter instance clearly and logically indicating it. In this case, there was none. Nor can an injury be inferred simply because there was an accident. There must be proof that the injury resulted from an accident.

The judgment of the Superior Court is reversed and the judgment of the Common Pleas in favor of defendant is reinstated.

Mr. Justice STERN dissents.