## Gavula *v.* Sims Company, Appellant.

Argued April 11, 1944. Before KELLER, P. J., BALD-RIGE, RHODES, HIRT, KENWORTHEY, RENO and JAMES, JJ.

*A. Grant Walker* with him *Gunnison, Fish, Gifford & Chapin,* for appellant.

*Paul A. Stephany,* for appellee.

OPINION BY KELLER, P. J., July 15, 1944:

The question involved in this workman's compensation case was whether the claimant, an electric welder, had suffered an accident while in the defendant's employ, which disabled him for 2-5/7 weeks, and required medical, surgical and hospital treatment. The amount of the claim is not in dispute.

The referee found that claimant had suffered an accident while so employed, as a result of which he had been disabled and had received medical, surgical and hospital treatment, and made an award accordingly. On appeal by defendant's insurance carrier, the board stated that it was unable to find any evidence of an accident as contemplated by the Workmen's Compensation Act, vacated the referee's fifth and tenth findings of fact [1] and second and third conclusions of law,

---

[1] The 5th and 10th findings of fact of the referee were as follows:

"Fifth: During this period of work [referred to in the 4th

and substituted therefor a somewhat different fifth finding, and a conclusion that claimant was not entitled to compensation. It did not disturb any other findings of the referee, but disallowed compensation, etc.

Claimant appealed to the court of common pleas which reversed the board, on the theory that the facts were not in dispute, and as they showed an accident, resulting in the disability for which compensation was claimed, the question was one of law, not fact, and therefore reviewable by the court, and entered judgment for the claimant.

The employer, by its insurance carrier, appealed to this court.

We agree with the court below that there is ample evidence in the record of an accident, which would sustain an award. In fact, there is no countervailing evidence. The defendant offered none.

If the testimony of Dr. Davis, the surgeon, is accepted as true, and we know of no reason why it should not be, —it seems reasonable, credible, and convincing to us— the claimant suffered an accident while at work for the defendant on October 9, 1941, to wit, the rupture[2] of

---

finding] claimant was in a constantly strained position being stooped over and endeavoring to balance himself. He had never before used this particular stool on a tank as high as this, as he ordinarily built a scaffold on which he could lie or stand at his work instead of stooping."

"Tenth: Claimant's disability was the result of the strain and tension and pressure to his back occasioned by his working in a stooped and balanced position during the period in question on October 9, 1941, and constituted an accident within the meaning of the Workmen's Compensation Act."

The 5th finding substituted by the board was:

"Fifth: During his work, claimant was in a stooped position. He had never before used this particular stool on this size tank, for which he ordinarily built a scaffold on which he could lie or stand at his work, instead of stooping. Claimant, however, commonly worked while in a stooping position."

[2] "Fracture, rupture, although they agree in meaning the act or an instance of breaking apart, are used in surgery and the physi-

an intervertebral disk [3] which, he definitely stated as his professional opinion, was caused by the prolonged period of claimant's stooping in a strained position, while at his work of welding, due to his attempt to keep himself stabilized on an insecure base. Claimant felt the pain at once on straightening up after he got on his feet on the floor. He consulted a doctor the next day, by whom his back was strapped. He was advised by this doctor to consult Dr. Davis, an orthopedic surgeon, who, on the following day, after hearing claimant's history of the occurrence and having examined him, diagnosed the trouble as rupture of an intervertebral disk, and advised an operation, which, on being performed by Dr. Davis, proved the correctness of his diagnosis and successfully relieved claimant's pain and disability, and restored him to a sound condition of body. Dr. Davis also testified that the rupture of an intervertebral disk is always traumatic, that is, due to an injury, which, however, may be an *internal strain;* e. g., a hernia produced by internal strain.

From the testimony of the claimant, which likewise was not disputed, he was working that afternoon in an unusual position. He was an electric welder and had

---

ological sciences as sharply differentiated terms. *Fracture* always implies the breaking of a hard or rigid substance, sometimes cartilage, but commonly bone; as a fracture of the skull or of the shoulder blade. *Rupture* usually implies the breaking of some softer tissue, such as the wall of a blood vessel." Webster's Dictionary of Synonyms. *Fracture.*

[3] *"Intervertebral disk*—Intervertebral fibrocartilage of discoidal form." ......

*"Intervertebral fibrocartilage,* the special kind of interarticular fibrocartilage between the bodies of vertebrae, forming disks separating any two bodies, closely adherent to both, tough and fibrous at the periphery, softer, pulpy, and more cartilaginous in the center, and constituting elastic cushions or buffers between the vertebral bodies, increasing the mobility and elasticity of the spinal column and diminishing the shock of concussion." Century Dictionary.

been so employed by defendant for five years. His work for some time had been welding headings on steel tanks, which varied in size or diameter from 12 inches up to 36 inches. The tank was placed on a jig 12 inches high, which, revolving, turned the tank away from him. When, working on a 24 inch tank he sat on a four-legged stool 31 inches high; when working on a smaller tank, he used a lower stool; so that the top of the tank, where the welding was done, was about level with the middle of his waist. If the tank was 36 inches in diameter he usually built a scaffold of planks higher than the tank, on which he *lay or reclined* while doing the welding. On the day in question he was welding the head on a tank 36 inches high, which, with the jig on which it revolved, made the top of it 48 inches above the floor, but instead of taking the time to build a scaffold, he put the 31 inch stool, which had a top about 13 inches in diameter, upon a round steel table, 19 inches high and 20 inches in diameter, so that the top of the stool was 2 inches higher than the top of the tank. He wore a welder's helmet weighing $1\frac{1}{2}$ to 2 pounds, and held the push button for running the jig in his left hand and the electric welder handle in his right hand. This brought him into a cramped stooping position, which increased as the tank moved away from him, and put him under a strain, by way of balancing himself so that the stool would not tip off the small table when the tank jarred. After he started in this position, although he found it uncomfortable, he worked on the tank for about half an hour, until it was finished, because if he stopped he would hold up another fellow working the other end of the tank. He did not attempt to straighten up until he stepped down from the stool to the table and then to the floor, and then felt a pain that "hit [him] in the back", which, at first, he thought was only a tired back, but, because of the continued and increasing pain, next day he consulted a doctor with the results above stated.

The findings of fact, even of the referee, were not as full and explicit as they should have been. The referee's 4th finding described the welding position fully and accurately, but his 8th did not definitely find that the disk rupture was caused by the prolonged strain. It was: "Eighth. Claimant consulted Dr. Storey, Erie, Pa. on October 10th, who referred him to Dr. A. G. Davis, Erie, Pa. He consulted Dr. Davis on October 11, 1941, who, upon examination, diagnosed his condition as an intervertebral disk rupture. Operation for correction of the condition was performed approximately October 15, 1941." From his conclusions of law one may infer that Dr. Davis had testified to the causal connection between the claimant's prolonged stooping and strained position, and the rupture of the intervertebral disk,—as he had done with much positiveness,— see pp. 27a, 28a, 29a, 30a,—and that he (the referee) had accepted this testimony as true; but he should have made a distinct finding of fact to that effect.

So, too, the board, while, for the most part, stating the testimony very fairly, made no distinct findings that it accepted the testimony as true or rejected it. For example, in its discussion the board said: "Claimant testified he sat in the stooped position for about 30 minutes and, that to balance himself, effort or strain was placed upon him. Claimant stated that he never used that particular stool on the metal table on that height of tank, but customarily would build a scaffold. When claimant stepped from the steel table and straightened up, he felt a pain in his back ...... Dr. A. G. Davis claimant's witness, an orthopedic surgeon, stated he first examined claimant October 11, 1941, later making a diagnosis of an intervertebral disk rupture. He made a lipiodal injection of the spine and performed an operation to relieve the rupture and removed the detritus from the intervertebral space. Dr. Davis stated that from the nature of claimant's work, the position in which

he was performing and the equipment used, he considered *that* the cause of the intervertebral disk rupture. He further testified an intervertebral disk rupture was always traumatic in origin."

If the board, in its discussion, intended those excerpts as statements of fact, then the assumption of the court below that there was no essential dispute of fact was justified, and the board's disallowance of compensation was, evidently, then based on the legal position, arrived at by it, that under the Adamchick and kindred cases,[4] the testimony of the claimant and Dr. Davis had not sufficiently proved an accident, and being a legal conclusion, it was reviewable by that court and by this one. And since, as we have before stated, the evidence in the record, if accepted as true, is amply sufficient to establish that the accident, viz., the rupture of the intervertebral disk, was caused or brought about by the strain resulting from claimant's unusual stooping and balancing posture, due to the unaccustomed use of the stool placed on top of a small table, instead of a plank scaffold on which he could recline while working, the case is not controlled by the Adamchick and kindred cases cited in note 4, but comes within the well-established rule that a compensable injury may occur in the course of the normal duties of an employee and without overexertion, when a strain, sprain or twist causes a *break* or sudden change in the physical structure or tissues of the body—that is, a *fracture* of the bone or bony cartilage, or a *rupture* of the softer tissues; as exemplified in *Buck v. Arndt,* 153 Pa. Superior Ct. 632, 34 A. 2d 823 (heart strain); *Camilli v. Penna. R. Co.,* 135 Pa. Superior Ct. 510, 7 A. 2d 129 (hernia); *Betts v. American Stores Co.,* 105 Pa. Superior Ct. 452, 161

---

[4] *Adamchick v. Wyoming Valley Collieries Co.,* 332 Pa. 401, 3 A. 2d 377; *Harring v. Glen Alden Coal Co.,* 332 Pa. 410, 3 A. 2d 381; *Crispin v. Leedom & Worrall Co.,* 341 Pa. 325, 19 A. 2d 400; *Parks v. Miller Ptg. Mach. Co.,* 336 Pa. 455, 9 A. 2d 742, etc.

A. 589 (pressure on the spine); *Falls v. Tennessee Furniture Co.,* 122 Pa. Superior Ct. 550, 186 A. 272 (rupture of gastric ulcer) ; *Witt v. Witt's Food Market,* 122 Pa. Superior Ct. 557, 186 A. 275 (heart strain) ; *Palermo v. North East Pres. Wks.,* 141 Pa. Superior Ct. 211, 15 A. 2d 44 (hernia) ; *Vitanza v. Iron City Prod. Co.,* 131 Pa. Superior Ct. 441, 446, 200 A. 311 (hernia).

It must be remembered that, so far as the testimony shows, claimant was a sound, healthy man. He had no disease which was aggravated by his work. Hence the cases dealing with a fortuitous happening which causes or aggravates a disease (*Good v. Pa. Dept. of P. & S.,* 346 Pa. 151, 30 A. 2d 434; *Clugh v. Nat'l Firepfg. Co.,* 151 Pa. Superior Ct. 630, 30 A. 2d 678; *Paydo v. Union Collieries Co.,* 146 Pa. Superior Ct. 385, 22 A. 2d, 759; *Rathmell v. Wesleyville Boro,* 154 Pa. Superior Ct. 351, 35 A. 2d 776—see also classification in *Parks v. Miller Ptg. Mach. Co.,* 336 Pa. 455, 9 A. 2d 742) are not applicable. The rupture was traumatic, such as could be caused by a prolonged strain, and in the judgment of the orthopedic surgeon, who correctly diagnosed the trouble and relieved it by an operation, it was so caused.

Unlike the circumstances in *Toohey v. Carnegie Coal Corp.,* 150 Pa. Superior Ct. 297, 28 A. 2d 362; *Apker v. Crown Can Co.,* 150 Pa. Superior Ct. 302, 28 A. 2d 551, and 728, and similar cases, the present claim does not rest solely on the employee's testimony of experiencing a sharp pain, followed sometime later by a disability which might be attributed to a condition not traumatic in origin, but due to a long-standing infection. The pain experienced by this claimant, after a prolonged position of strain was promptly diagnosed by a skilled orthopedic surgeon as an intervertebral disk *rupture,* traumatic in nature and resulting from that strain, and an operation performed within a few days thereafter demonstrated the correctness of the diagnosis and restored the patient to a sound condition of body; thus

214

proving the causal connection between the accident and the disability.

The difficulty here, however, is that there are no distinct *findings of fact* which will support the judgment. It is possible—even probable—that such findings may be inferred from the decision of the referee and the opinion of the board; but we have ruled so often that the courts, including this court, cannot substitute their findings for those of the board,[5] that we cannot ourselves violate it by *inferring* findings not actually *made*. We cannot do here what we did in *Buck v. Arndt*, 153 Pa. Superior Ct. 632, 34 A. 2d 823, a case similar in many respects, for there the board specifically adopted all of the referee's findings of fact, and reversed only his conclusion of law, that, upon the facts so found, the claimant had sustained a compensable accident. In that case we affirmed the court below in its correction of the board's error of law.

All we can do here is to reverse the judgment of the court below and refer the case back to the board to clarify its position, and state whether it accepts the testimony of Dr. Davis and the claimant as correctly reciting the facts. If it does accept them as facts, then, following the law as above stated by us, an award in favor of the claimant should be made, in accordance with the opinion of the court below, for the facts so found establish a compensable accident. On the other hand, if the board rejects the material testimony of Dr. Davis and the claimant—and its action in doing so is not arbitrary and capricious—the claim should be disallowed.

The judgment is reversed and the record is ordered remanded to the board for further consideration and determination consistent with this opinion.

[5] *Apker v. Crown Can Co.*, 150 Pa. Superior Ct. 302, 304, 28 A. 2d 551 & 728; *Hudek v. United Eng. & Foundry Co.*, 152 Pa. Superior Ct. 493, 33 A. 2d 41; *Kattera v. Burrell C. & S. Co.*, 152 Pa. Superior Ct. 591, 33 A. 2d 498.